*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0087p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

SANTIAGO PABLO-SANCHEZ, MARIA
CONSUELO BARRERA-NAVA, FANY PABLO-
BARRERA, REYNA PABLO-BARRERA, JORGE
PABLO-BARRERA, SANTIAGO PABLO-
BARRERA,

No. 09-3301

               *Petitioners,*

     *v.*

ERIC H. HOLDER, JR., Attorney General,

               *Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A095-394-346/347; A072-415-044/045/046/047.

Argued: March 9, 2010

Decided and Filed: March 30, 2010

Before: GIBBONS, SUTTON and WHITE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** E. Dennis Muchnicki, LAW OFFICE, Dublin, Ohio, for Petitioners. Jeffrey R. Meyer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** E. Dennis Muchnicki, LAW OFFICE, Dublin, Ohio, for Petitioners. Jeffrey R. Meyer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

————————————

## OPINION

————————————

SUTTON, Circuit Judge. Santiago Pablo-Sanchez, his wife and four children, all natives and citizens of Mexico, ask us to review a decision of the Board of Immigration Appeals denying withholding of removal. Because the BIA permissibly determined that

1

Pablo-Sanchez did not suffer mistreatment on account of his political opinions, we deny the petition.

I.

In 1994, Pablo-Sanchez, a well-to-do artist and business owner, campaigned as the Green Party candidate for a seat in Mexico's Congress. His campaign encountered stiff opposition from the then-incumbent PRI party. Hecklers, says Pablo-Sanchez, threatened him at his campaign rallies, and he received phone messages demanding that he "stop participating with this party or things w[ill] not go well for [your] family." A.R. 177. One of the hecklers, whom Pablo-Sanchez believes was affiliated with the PRI, had a distinctive voice, which Pablo-Sanchez described as "hoarse and deep . . . and strident." A.R. 179. Pablo-Sanchez lost the election and soon left the Green Party due to the harassment.

In March 1996, about a year and a half later, Pablo-Sanchez visited a bank. After he left the bank carrying a large amount of cash, muggers covered his face and assaulted and robbed him. As his assailants beat him, Pablo-Sanchez says he heard one of the muggers say in a familiar voice, the same one he remembered from the campaign trail, "is that what you wanted, huh, is that what you were asking for, you want more of this." A.R. 180–81. Later, in November of that year, Pablo-Sanchez was mugged and beaten a second time, again, according to his original application, after going to a bank, and again he heard "exactly the same voice" threaten him during the assault. A.R. 181. During roughly the same time period, a telephone caller with the familiar deep voice threatened Pablo-Sanchez and his family. Pablo-Sanchez reported the muggings and threatening phone calls to the police, but he had "little information for them," and they never caught the criminals. A.R. 264. The police did not investigate his claims, he believes, because he did not bribe them.

In April 1997, Pablo-Sanchez left Mexico and illegally entered the United States. His wife and children remained in Mexico while gathering resources to come to the United States, and they continued to receive threatening phone calls. Maria Consuelo Barrera-Nava, Pablo-Sanchez's wife, testified that the phone calls began to include details such as what she was wearing that day and what time she had arrived home, suggesting that the individuals responsible for the call were watching her home. Barrera-Nava described the telephone harasser as having "a hoarse voice but it was at the same time strident." A.R. 214. The

harassment peaked when, after a telephone message promising a "visit," an intruder entered the family's home at night and raped Barrera-Nava. A.R. 214–15. When she reported the sexual assault to the police, they "laugh[ed]" and "li[t] a cigarette." A.R. 216. In January 1998, Barrera-Nava and the children illegally entered the United States, joining Pablo-Sanchez.

In January 2002, Pablo-Sanchez applied for asylum. He waited nearly five years to file his application, he says, because he could not find anyone bilingual until then. In his 2002 application, he enlisted the help of "Mr. Viatoro," who promised to be a "notario" versed in immigration law. A.R. 185, 202. Signed by Pablo-Sanchez alone, the application said nothing about political activity or persecution but instead said that "criminals" were responsible for the harassment. A.R. 447–49. At Viatoro's advice, Pablo-Sanchez says, he omitted any mention of politics. When interviewed by an asylum officer in July 2005, Pablo-Sanchez claimed not to have been involved in politics but instead said he fled from Mexico due to frequent criminal activity against business owners.

In June 2006, Pablo-Sanchez amended his asylum application, this time with the help of counsel. While his original application emphasized that he was on business when mugged and included no mention of the recognizable voice, his amended application described his political activities in detail and did not say that criminals targeted him due to his business interests.

In April 2007, Pablo-Sanchez and his family appeared before the IJ and testified consistently with the amended application, conceding removability, but asking for asylum, withholding of removal and protection under the Convention Against Torture. The IJ rejected the asylum application because Pablo-Sanchez had waited more than one year after entering the country to file it. *See* 8 U.S.C. § 1158(a)(2)(B). Because Pablo-Sanchez's hearing testimony and amended application differed so dramatically from his original application, the IJ found that Pablo-Sanchez was not a credible witness and denied withholding of removal on that ground. Alternatively, the IJ concluded that, even if Pablo-Sanchez's testimony had been credible, he was not entitled to withholding of removal because the alleged harassment was not "on account of" his political opinions. 8 U.S.C. § 1101(a)(42)(A); *see id.* §§ 1158(b)(1)(B), 1231(b)(3). As for the claim under the

Convention Against Torture, the IJ ruled that Pablo-Sanchez had not proved that he or his family faced torture at the hands of, or with the acquiescence of, public officials.

Pablo-Sanchez appealed the IJ's decision to the Board of Immigration Appeals. Although the Board thought the IJ had erred in disbelieving Barrera-Nava's rape testimony, it affirmed his credibility determination as to Pablo-Sanchez, reasoning that the IJ had "not unreasonabl[y]" interpreted Pablo-Sanchez's inconsistent accounts. A.R. 5. It alternatively agreed with the IJ that, even assuming credibility, Pablo-Sanchez had not proved (1) that he and his family suffered past persecution on account of his politics, (2) that he and his family faced a likely threat to their lives and freedom upon return to Mexico on account of his politics, (3) that he could not avail himself of protection from the Mexican government and (4) that he and his family qualified for protection under the Torture Convention. Pablo-Sanchez timely seeks review of the Board's decision, challenging only the adverse credibility determination and the denial of withholding of removal.

## II.

Because the Board "issue[d] a separate opinion, rather than summarily affirming" and adopting the IJ's decision, we review the Board's decision "as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). We review agency factual findings, whether made by the Board or the IJ, under the deferential substantial-evidence standard, meaning that the findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Khalili*, 557 F.3d at 435; *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007) (factual findings include credibility determinations).

To qualify for withholding of removal, Pablo-Sanchez must demonstrate that he faces a "clear probability" of "persecution" based on his "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *Kouljinski v. Keisler*, 505 F.3d 534, 544 (6th Cir. 2007). The "clear probability" standard asks more of the applicant than the "reasonable possibility" standard for obtaining asylum because it requires the applicant to show that "it is more likely than not" that his life or freedom would be threatened by persecution if he returned to his home country. *Al-Ghorbani v. Holder*, 585 F.3d 980, 993–94 (6th Cir. 2009) (quotation marks omitted). An

applicant who proves *past* persecution on account of his political opinion merits a presumption of a "well-founded fear of [suffering] future persecution." 8 C.F.R. § 208.13(b)(1). In this instance, Pablo-Sanchez challenges the BIA's resolution of his arguments about past persecution, arguing that the evidence established past persecution based on a protected ground and therefore entitled him to a presumption of future persecution.

Under these circumstances, to be eligible for relief or at least further inquiry on remand, Pablo-Sanchez must show that a reasonable adjudicator would be compelled to conclude that (1) his testimony was credible and (2) he suffered from past persecution based on his political opinions. If he fails on either point, his petition must be rejected.

Even if we accept Pablo-Sanchez's credibility for the sake of argument, he cannot show that the evidence compels us to conclude that his past mistreatment was on account of his political opinion. A petitioner must provide some evidence of his persecutor's motive, "direct or circumstantial." *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). "[I]t is not enough to present evidence that the applicant *had* a political opinion . . . . Evidence must be presented which suggests that the applicant was persecuted *on account of* or *because of* the political opinion." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004).

The sole link between Pablo-Sanchez's political opinions and the assaults and threatening phone calls was a deep and strident voice he thought he recognized from one of his campaign rallies 18 months earlier. Inferring a motive from this kind of evidence requires several inferential leaps that strain the boundaries of circumstantial evidence. More to the point, any inferences we might draw from this effort at voice identification turn on permissible inferences, not mandatory ones.

Even if we assumed that Pablo-Sanchez's harasser and the campaign rally heckler were one and the same, we still would have to infer that he assaulted and robbed Pablo-Sanchez out of political animus. That must be the case, Pablo-Sanchez says, because he "had no other enemies." A.R. 182. But one does not need an enemy to be the victim of a robbery. One needs money. And Pablo-Sanchez had plenty of that when he was mugged, because he had just left a bank after making substantial cash withdrawals before the first robbery and, according to his original application (and not contradicted in his second), he

had just left a bank before the second robbery. Thus, when the assailants targeted Pablo-Sanchez for robbery and telephone harassment, it is just as likely (if not more likely) that they were motivated by his wealth as by the partisan affiliation he had renounced 18 months later. So long as that is the case, it is not possible to second guess the BIA's judgment on the ground that a reasonable adjudicator would be "compelled to conclude to the contrary."

While the sexual assault against Pablo-Sanchez's wife was a far more offensive crime, it has a far more attenuated connection to his political opinions. Barrera-Nava "kept a distance" from her husband's political activities, A.R. 211, and linked her telephone harasser to her husband's politics only by offering a description of a deep voice that matched the description offered by Pablo-Sanchez. Perhaps as a result, one might say, she could link her rape to the telephone harassment. But she offered no description of the rapist's voice, much less any reason for thinking that the rapist was motivated by political animus, as opposed to the perversity normally underlying such crimes.

Pablo-Sanchez is right that the "context of the applicant's situation," *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) (per curiam), may permit the Board to connect the dots of circumstantial evidence and find persecution on account of a protected ground, *see Bu v. Gonzales*, 490 F.3d 424, 430 (6th Cir. 2007). But to say that the Board could find circumstantial proof of persecution in a given case is not to say that it must—and that, regrettably for Pablo-Sanchez, is the only inquiry with which we are tasked.

But wait, Pablo-Sanchez says, there is more: In rejecting his petition, the Board "[i]nvented" a "novel, unprecedented position that there is no nexus between persecution and a protected ground *unless* the persecutor stat[ed] his motivations while . . . in the act of persecuting." Br. at 20, 22. That, indeed, would be a novel rule—and an incorrect one to boot. While it often will be the case that the surrounding circumstances of an act of persecution (a physical assault *during* a demonstration or the words *accompanying* a physical assault after a demonstration) will reveal a persecutor's motive, that need not always be the case. What is a frequent way of proving motive is not the only way. One premise of Pablo-Sanchez's argument, then, is correct.

The other premise is not, however. The Board never announced any such rule. In full, its two-paragraph analysis of the past-persecution claim reads:

Even if we assume the respondent is credible, the Immigration Judge did not err in concluding that the respondent failed to provide a nexus between his political affiliation and the events that occurred in Mexico (NOA; I.J. at 17, 19). In order to demonstrate that an applicant has been persecuted on account of a political opinion, evidence must be presented which suggests that the applicant was persecuted "on account of" the actual or imputed political opinion. *See Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004). Thus, an applicant must show that his actions were interpreted as political by the alleged persecutors. *See id.* at 987. An applicant is not expected to provide direct proof of the alleged persecutor's motive, but must show some evidence of it, direct or circumstantial (Respondent brief at 19). *Id.*

In this case, the lead respondent testified that during his alleged incidents of physical harm, he recognized the deep, hoarse voice of the political opponent previously heard while he campaigned as a Green Party candidate in 1994 (Respondent brief 19; Tr. at 38, 41–44, 57–60). The lead respondent also stated that but for his political activities which ended in 1994, he had no reason to suffer or fear harm (Respondent brief at 19; I.J. at 6; Tr. at 44–45). The lead respondent's wife also stated that the telephone threats she received after April 1997, and the voice heard outside her house, were from a man with the same hoarse, deep voice described by her husband (Respondent brief at 19; Tr. at 75–76). The lead respondent's wife related that she believed she identified her rapist because on one occasion, the caller with the hoarse, deep voice, expressed that she would be receiving a visitor (Respondent Br. at 19; Tr. at 81). The respondents' beliefs however are insufficient to establish the motive of the attackers. In this respect, the Immigration Judge stated that even if a political opponent was responsible for physically harming the respondents, specific references to the respondents' actual or imputed political opinion or membership in a particular social group were never uttered during the aforementioned incidents (Respondent brief at 5–6, 11–12, 20; I.J. at 5, 11, 17–18; Tr. at 42–43, 46, 74, 81). Therefore, the Immigration Judge's finding that the lead respondent had not provided a nexus between the harm suffered and a protected ground is not erroneous."

A.R. 5.

The first paragraph of this analysis describes the legal requirements for establishing a claim of past persecution, and the Board plainly invents no new rule of proof in doing so. It correctly says that "[a]n applicant *is not expected* to provide *direct proof* of the alleged persecutor's motive," whether before, during or after the persecution, "but must show some evidence of it, direct or circumstantial." (Emphasis added). That an applicant need not provide "direct proof" of motive negates the subsidiary possibility of requiring an applicant to provide direct proof during the act of persecution. The second paragraph of this analysis

applies the law to the facts, and the Board properly explains that the record contains no evidence of motive since Pablo-Sanchez's short stint in politics in 1994, including any evidence of motive that could have come during the acts of violence and harassment.

If read by themselves, it is true, the last two sentences of the second paragraph might support Pablo-Sanchez's reading. But context is everything. When read in the surroundings of the full two-paragraph analysis, the two sentences do not indicate that the Board, in applying the law to the facts of the case, suddenly invented a new persecutor-motive rule. The Board does not cite any cases, only the record, in making these points, indicating it was applying the previously announced, and correctly announced, legal principles identified in the first paragraph of its analysis. One of the record citations, moreover, is to the IJ's opinion at the very pages (IJ at 17–18) where the IJ properly speaks about the absence of any evidence of political motive in connection with any of the assaults and where the IJ does not say that cognizable evidence of political motive may arise *only during* an act of persecution. *See Khalili*, 557 F.3d at 435 ("To the extent the BIA adopted the immigration judge's reasoning, however, this Court also review the immigration judge's decision."); *Joseph v. Attorney General*, 421 F.3d 224, 226 n.4 (3d Cir. 2005) ("Although we are reviewing the decision of the BIA, not that of the IJ, the BIA's ruling cannot be understood in a vacuum, given its analysis. Thus, we must refer to the IJ's analysis in order to provide the proper context and background for our analysis of the BIA's ruling.").

When all is said and done: the alleged persecution took place more than a year and a half after Pablo-Sanchez ended his brief foray in politics; the evidence of motive required the factfinder to jump through several inferential hoops; and run-of-the-mine criminal depravity by itself provides at least as plausible an explanation, if not a more plausible explanation, for the unfortunate mistreatment of Pablo-Sanchez and his family. That does not suffice to conclude that the Board necessarily decided this case wrongly.

III.

For these reasons, we deny the petition for review.