NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0425n.06

No. 09-4295

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jun 28, 2011*

LEONARD GREEN, Clerk

JAURI HAMZAH,                                              )
                                                          )
    Petitioner,                           )    ON APPEAL FROM THE
                                                          )    BOARD OF IMMIGRATION
    v.                                    )    APPEALS
                                                          )
ERIC HOLDER, JR., Attorney General,                       )
                                                          )    **OPINION**
    Respondent.                           )
_____ )

**Before: KEITH, GIBBONS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Petitioner Jauri Hamzah (Hamzah), a citizen of

Indonesia and a convert from Islam to Christianity, seeks withholding of removal based on his claims

of past persecution and a well-founded fear of future persecution. Hamzah filed applications for

asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The

Immigration Judge (IJ) and the Board of Immigration Appeals (BIA) denied Hamzah's applications.

Hamzah seeks review of the BIA's decision, challenging only the BIA's denial of his application for

withholding of removal. We **AFFIRM**.

**I.**

Hamzah was born in Makassar, South Sulawesi, Indonesia. He has three brothers and two

sisters who currently reside in Indonesia. His mother lives in South Sulawesi, and his father passed

away in Indonesia in 2003. Hamzah testified that his grandfather was the King of Watamvone, and

1

that he belongs to the Watamvone tribe, which is composed of indigenous people. According to Hamzah, this tribe is Muslim and its practice of Islam is very strict.

Hamzah's mother is Christian and his father was Muslim. They were married by an Islamic cleric and were able to register their marriage with the government of Indonesia. Hamzah testified that the Watamvone tribe ridiculed his father for marrying a Christian woman, but the couple was not physically harmed. According to Hamzah, his parents agreed that their male children would be raised Muslim and their female children would be raised Christian. As a result, Hamzah's brothers are Muslim and his sisters are Christian. Hamzah testified that he was born a Shi'a Muslim. Hamzah's mother placed him in a private Christian middle school, where he received Bible teachings and learned that Jesus loves everyone; he was also exposed to Christianity through his friends at work. These experiences prompted Hamzah to think about converting. Nevertheless, Hamzah stated that he attended the mosque regularly until his seventeenth or eighteenth birthday and celebrated Islamic holidays. He was, however, unable to satisfactorily answer several questions asked by the IJ regarding Islam.

Hamzah testified that he converted to Christianity in 1985 and was baptized.[1] He met his wife, who is Christian, in 1990, and they married in 1993. According to Hamzah, in Islam a religious conversion is equivalent to death. Hamzah testified that after he converted to Christianity, he was threatened by his father, who also disowned him, his brothers, members of the Watamvone tribe, and members of the Bugists tribe, which is a tribe of extremist Muslims. He stated that he

---

[1]Hamzah stated on his asylum application that he became a Christian after marrying his fiancee in 1993. At the merits hearing, he explained that despite being baptized in 1985, he decided to become a more devout Christian only after his marriage. Between 1985 and 1993, Hamzah did not feel that he had surrendered to his faith because he hid that he was a Christian and worshiped in secret.

received threats that he was going to be tortured and terrorized. He did not report any of these threats to the police because the majority of Indonesia's population is Muslim and he felt that the police would not help him.

In 1993, Hamzah moved to Jakarta, Indonesia with his wife and they began attending the Maranata Church; Hamzah played music at the church while his wife assisted at the prayer services and led youth Bible study. Hamzah testified that while he was living in Jakarta, members of a group called Jihad Extreme Islam (Jihad) threatened to torture him because their goal was to destroy Christians and places of worship. He stated that members of Jihad were able to identify Christians by their identification cards, the presence of crosses or fish symbols in or on their cars, and the Bibles that were in their possession, and that he was identified as a Christian because he had a fish symbol on his car and a cross hanging from his rearview mirror. When asked how these threats were conveyed to him, Hamzah said that they were "stated directly," but did not elaborate further. He did not report these threats because of his fear of the police.

Hamzah also testified that while he was living in Jakarta, he observed Muslims throw rocks and animal feces at homes where Christian prayer services were held. His home was never attacked, but he was present when his church leader's house was attacked. In response to questions regarding why he failed to include this information in his asylum application, Hamzah first stated that his house was never attacked and then said that he had forgotten about these incidents.

Hamzah, his wife, and their child eventually left Indonesia for the United States. Hamzah was admitted to the United States on October 18, 1997, as a non-immigrant visitor for pleasure with authorization to remain in the United States until April 17, 1998. The family initially moved to California and then relocated to Oklahoma two months later. Hamzah lived in Oklahoma with his

3

family for seven years and attended the IFGF church there. He and his family subsequently returned to California and began attending the IFGF church in Arcadia.

The Department of Homeland Security (DHS) commenced removal proceedings by filing a notice to appear (NTA), dated April 7, 2003, with the Immigration Court. The NTA charged Hamzah with being subject to removal from the United States pursuant to Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), 8 U.S.C. § 1227(a)(1)(B). On February 4, 2005, Hamzah appeared with counsel before an IJ in Detroit. Hamzah admitted the allegations contained in the NTA, conceded the charge of removability, and declined to designate a country of removal. The government designated Indonesia as the country of removal.

On October 6, 2006, Hamzah filed applications for asylum, withholding of removal, and protection under the CAT with the Immigration Court. On February 11, 2008, Hamzah appeared with counsel before an IJ in Detroit for his merits hearing and testified in support of his applications. When he was asked what he thought would happen to him if he returned to Indonesia, Hamzah stated that he was afraid that he would be threatened. He acknowledged that he had never been physically harmed as a result of his conversion, and that his mother, who lives in Indonesia, had not been physically harmed on account of her religion. However, Hamzah testified that he did not keep in touch with his sisters because they frequently moved "from one place to another," as they felt threatened due to their religion. Hamzah also acknowledged that certain provinces in Indonesia had a majority-Christian population, but stated that he could not live in these areas because extremist Muslims were everywhere and the government was unable to fully control these individuals.

Following the conclusion of the testimony, the IJ issued an oral decision denying all of Hamzah's applications and ordering him to be removed to Indonesia. The IJ concluded that

4

Hamzah's asylum application was untimely because he did not file it within a year of his last entry into the United States and failed to demonstrate "changed circumstances" to excuse the late filing. Moreover, the IJ found that Hamzah was not credible under the provisions of the REAL ID Act of 2005, stating that Hamzah's "lack of veracity" went "to an issue which [was] at the very heart of his claim." The IJ did "not find credible [Hamzah's] assertion that he was even born Muslim," due to Hamzah's failure to identify "the basic tenants [sic] or principals [sic] of Islam," his evasive demeanor when he was asked "basic questions regarding the faith that he apparently was born in before conversion," his failure to "identify basic differences between Sunni and Shi'a Muslims," and his inability to explain what Ramadan was and when it occurred. The IJ also noted that Hamzah omitted information regarding attacks on homes where prayer meetings were taking place from his application and articulated inconsistent explanations for this omission, and that the record was "devoid of a single piece of cooberative [sic] evidence regarding any aspect of [Hamzah's] claim as it [related] to . . . threats that occurred in Indonesia."

Further, the IJ found that even assuming Hamzah's credibility, he failed to demonstrate eligibility for asylum and withholding of removal because he did not show past persecution, as he never suffered any physical harm and his description of the threats he allegedly received was vague. Moreover, the IJ determined that Hamzah could not establish a well-founded fear of future persecution, as country-condition information did not support Hamzah's assertion that he would be harmed or threatened if returned to Indonesia because of his conversion. Finally, the IJ denied Hamzah's application for protection under the CAT, finding that Hamzah failed to present any evidence that it was more likely than not that Hamzah would be tortured if removed to Indonesia.[2]

---

[2]The IJ also denied Hamzah's request for voluntary departure.

5

On February 22, 2008, Hamzah timely appealed the IJ's decision to the BIA. The BIA issued a decision dismissing Hamzah's appeal on September 29, 2009. It first noted that the record supported the IJ's finding that Hamzah was "ineligible for asylum due to the 1-year filing deadline." Additionally, with respect to Hamzah's application for withholding of removal, the BIA stated that it agreed with the IJ's determination that, even assuming Hamzah's credibility, he had "failed to sustain his burden of proof in establishing either past persecution and/or a likelihood of future persecution." The BIA reasoned that the "fact that [Hamzah] never suffered any physical harm bolster[ed] the [IJ's] conclusion that [Hamzah] ha[d] not established past persecution in Indonesia on account of religion," "the record of country conditions reflect[ed] that religious conversions [were] allowed by Indonesian law and that couples, like [Hamzah] and his Christian-born wife, [would] convert in order to have their marriages registered," and "while some sporadic instances of violence exist[ed] between religious factions in Indonesia, the Indonesian government's policy continued to contribute to the generally free practice of religion, including those of the Christian faith." Finally, the BIA concluded that there was no reason to disturb the IJ's denial of Hamzah's application for protection under the CAT. Hamzah timely appealed the BIA's decision.

## II.

Hamzah explicitly states in his opening brief that he is not challenging the IJ's denial of his applications for asylum and for protection under the CAT. Thus, Hamzah's only claim on appeal is that he is statutorily eligible for withholding of removal.

## A.

As a threshold matter, Hamzah acknowledges that this case does not revolve around the issue of credibility, as the BIA found that he would be ineligible for withholding of removal even if

assumed to be credible. Nevertheless, he argues that the IJ's credibility findings are not supported by substantial evidence. We have held that

> when an IJ or the BIA expresses suspicion about an applicant's lack of credibility but the BIA fails to make an explicit adverse determination and instead denies relief on some other basis, we will assume that the applicant was credible in order to review the actual grounds for the ruling . . . . If we conclude that the stated basis for denying relief was supported by substantial evidence, further review is foreclosed. If the evidence compels the opposite result, however, we will remand for a credibility determination.

*Haider v. Holder*, 595 F.3d 276, 282 (6th Cir. 2010). Here, the BIA agreed with the IJ's determination that, even assuming that Hamzah was credible, Hamzah had "failed to sustain his burden of proof in establishing either past persecution and/or a likelihood of future persecution." Thus, because the BIA did not make an explicit adverse determination on the issue of credibility, we will assume that Hamzah is credible and proceed to review the actual grounds for the BIA's decision

**B.**

"Because the BIA adopted the IJ's decision with additional commentary, we review the decision of the IJ, as supplemented by the BIA, as the final administrative order." *Acquaah v. Holder*, 589 F.3d 332, 334 (6th Cir. 2009) (citation omitted). "We review the IJ's and BIA's findings for substantial evidence and may reverse only if the decision was 'manifestly contrary to law,' that is, if the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1149 (6th Cir. 2010) (citations omitted) (emphasis in original).

To establish eligibility for withholding of removal, Hamzah must demonstrate that he faces a "clear probability" of "persecution" based on his "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *Pablo-Sanchez v. Holder*, 600 F.3d 592, 594 (6th Cir. 2010) (citations omitted). The "clear probability" standard is more

7

demanding "than the 'reasonable possibility' standard for obtaining asylum because it requires the applicant to show that 'it is more likely than not' that his life or freedom would be threatened by persecution if he returned to his home country." *Pablo-Sanchez*, 600 F.3d at 594 (citation omitted). An applicant who proves past persecution merits a presumption of a "well-founded fear of future persecution." 8 C.F.R. § 208.13(b)(1).

Persecution is defined as "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim," *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010) (citation omitted), and "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998); *see also Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005).

In this case, Hamzah alleges past persecution based solely on threats he purportedly received from his family members and Muslim extremists after converting to Christianity. When questioned about these alleged threats, Hamzah was unable to state the content of the threats or explain how he received them. None of the affidavits Hamzah enclosed with his applications mentioned that Hamzah had been threatened, and no witnesses testified on Hamzah's behalf at the February 11, 2008 merits hearing. Hamzah never reported these threats, and he was never physically punished, harmed, or deprived of liberty despite living in Indonesia for twelve years following his conversion. Hamzah also admitted that the Indonesian government was working to control extremist Muslim groups at the time that he lived in Indonesia. In light of these circumstances, the IJ's and the BIA's finding that Hamzah failed to establish past persecution is supported by substantial evidence.

Hamzah also claims that he has a well-founded fear of future persecution because he fears that he will be harmed by his family members and Muslim extremists as a result of his conversion if forced to return to Indonesia, and the Indonesian government is unable or unwilling to protect him.[3] He further states that his mother and sisters, who live in Indonesia, have had to move around constantly due to their Christian religion, that he would receive death threats if he returned to Indonesia, and that the Indonesian government "bans conversion" because it "bans dissemination of religious materials to persons of other faiths."

The 2006 report on Indonesia's human rights practices (Country Report) states that the Indonesian government has recognized six of the major religions, including Christianity, and that other religious groups were able to register with the government. The 2007 report on Indonesia's religious freedom (Freedom Report) notes that "[t]he Constitution provides for freedom of religion[] and the [g]overnment generally respected this right in practice." The 2007 Freedom Report observes that "[t]here were notable efforts in several provinces to build interfaith harmony" during the

---

[3]Hamzah also argues for the first time that Christian Indonesians are a disfavored group, relying on the Ninth Circuit's decision in *Tampubolon v. Holder*, 610 F.3d 1056 (9th Cir. 2010). The Ninth Circuit has held that "members of disfavored minority groups – that is, groups subjected to extensive persecution in a given locale – can establish a well-founded fear of future persecution by proving that they have suffered past harm." *Grichaev v. Holder*, No. 09-3337, 2011 WL 915910, at *2 (6th Cir. Mar. 17, 2011). This court has not yet adopted this rule. *Id.* Further, *Tampubolon* involved a claim of persecution based on the petitioners' religion (Christianity), and not based on conversion from Islam to Christianity. *See Tampubolon*, 610 F.3d at 1058. Hamzah's claim of persecution only concerns his conversion. Finally, the Ninth Circuit held in *Wakkary v. Holder*, 558 F.3d 1049, 1065 (9th Cir. 2009), that "disfavored group analysis does not alter the *quantitative* standard of proof. Rather, it determines what sorts of evidence can be used to meet that standard, and, quite generally, in what proportions." (emphasis in original). In the context of withholding of removal, the applicant "must [still] show that his chance of future persecution is greater than fifty percent. Evidence of group discrimination will go part of the way toward meeting that bar . . . . [but] *some* evidence of individualized risk is necessary for the petitioner to succeed." *Id.* (emphasis in original). Therefore, Hamzah's claim fails even under the Ninth Circuit's "disfavored group" analysis.

9

reporting period and that "religiously motivated violence declined significantly in [several areas]." This report also states that police in Indonesia "continued to crack down on and arrest . . . suspects accused of terrorism and other violent crimes related to interreligious strife . . . ."

With respect to the issue of religious conversion, the 2007 Freedom Report notes that men and women of different religions faced obstacles in marrying and officially registering their marriages with the Indonesian government and, as a result, "some persons converted in order to marry." According to the 2007 Freedom Report, there were no reports of forced religious conversions in Indonesia. Further, this report states that "[u]nforced conversions between religious groups occurred, as allowed by law. . . . Some converted to marry a person of another religion; others converted in response to religious outreach or social activities organized by religious groups."

Thus, Hamzah's claim of future persecution based on his religious conversion is not supported by either the 2006 Country Report or the 2007 Freedom Report, which indicate that the Indonesian government generally respects the principle of religious freedom and permits voluntary conversions. *See Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004) (holding that such reports "are generally the best source of information on conditions in foreign nations").

Further, Hamzah's argument that the Indonesian government is unwilling or unable to protect him from persecution is unavailing. When a withholding of removal claim "focuses on non-governmental conduct, its fate depends on some showing either that the alleged persecutors are aligned with the government or that the government is unwilling or unable to control them." *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009) (citing *Raza v. Gonzales*, 484 F.3d 125, 129 (1st Cir. 2007)). The 2007 Freedom Report observes that the Indonesian government continued to make strides in arresting and prosecuting individuals involved in violence against other religious groups.

10

Even though both reports discuss voluntary conversion, neither mentions any instances of violence against converts. The 2007 Freedom Report merely states that "[s]ome converts felt compelled not to publicize the event for family and social reasons." Additionally, Hamzah's father – the family member who most opposed Hamzah's conversion – is deceased. Although Hamzah claims that the "Indonesian [g]overnment ha[d] never assisted [him] and there is no indication, based on the country reports, that [it] would," Hamzah conceded at his merits hearing that he never reported any of the alleged threats to the authorities.

Given that Hamzah has not presented any evidence showing that he would more likely than not be persecuted on account of his religious conversion if he returned to Indonesia, the IJ's and the BIA's finding that Hamzah failed to establish a well-founded fear of future persecution is supported by substantial evidence.

### III.

In light of the foregoing discussion, we **AFFIRM** the BIA's decision denying Hamzah's applications for asylum, withholding of removal, and protection under the CAT.