**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

RUBEN HUEZO-CEDILLOS,

Petitioner,

v.

ROBERT M. WILKINSON, Acting
Attorney General,

Respondent.

No.    19-70732

Agency No. A078-465-876

MEMORANDUM[*]

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 11, 2021
San Francisco, California

Before: BERZON, CHRISTEN, and BADE, Circuit Judges.

Ruben Huezo-Cedillos, a native and citizen of El Salvador, petitions for

review of the Board of Immigration Appeals' (BIA) order affirming, without

opinion, an Immigration Judge's (IJ) decision denying Huezo's applications for

withholding of removal and protection under the Convention Against Torture

---

[*]     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

(CAT). We have jurisdiction pursuant to 8 U.S.C. § 1252(a) and we dismiss the petition in part, deny in part, grant in part, and remand to the agency with instructions to grant CAT relief.

Where "the BIA summarily affirms the IJ's decision, we review the IJ's decision as the final agency action." *Zehatye v. Gonzales*, 453 F.3d 1182, 1184 (9th Cir. 2006). "We review the [IJ's] legal determinations de novo and its factual findings for substantial evidence." *Singh v. Holder*, 656 F.3d 1047, 1051 (9th Cir. 2011). "Under the substantial evidence standard, we will uphold the agency's decision 'if the decision is supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Id.* (quoting *Tampubolon v. Holder*, 610 F.3d 1056, 1059 (9th Cir. 2010)). "We will reverse the agency when the evidence in the record compels a reasonable factfinder to conclude that the agency's decision is incorrect." *Id.* at 1051–52 (citation, internal quotation marks, and alteration omitted).

1. Our jurisdiction to review removal orders is limited by the requirement that the petitioner "exhaust[] all administrative remedies available." 8 U.S.C. § 1252(d)(1). "[T]he principle of exhaustion may exclude certain constitutional challenges that are not within the competence of administrative agencies to decide," such as due process claims, "but only if they involve more

2

than 'mere procedural error' that an administrative tribunal could remedy." *Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004) (citation omitted). Huezo did not exhaust his argument that his due process rights were violated by the IJ's failure to inform him in 2014 of his apparent eligibility for cancellation of removal, and we dismiss this portion of the petition for lack of jurisdiction. *Id.* at 677.

2. Huezo's withholding of removal claim was premised on his membership in two proposed particular social groups: (1) "former members of the [gang] MS-13"; and (2) "[i]ndividuals with tattoos indicating their . . . former gang membership." The IJ explained that "[t]he country conditions evidence in the record does not establish that ex-gang members, or those with tattoos that indicate membership in a gang, are singled out for persecution," and determined that neither of these two proposed groups were cognizable. We conclude the IJ's determination was supported by substantial evidence. *See Reyes v. Lynch*, 842 F.3d 1125, 1137–38 (9th Cir. 2016) (upholding BIA's determination that "former members of the Mara 18 gang in El Salvador who have renounced their membership" was not cognizable); *Arteaga v. Mukasey*, 511 F.3d 940, 945 (9th Cir. 2007) (explaining that "'[t]attooed gang member' falls outside the Ninth Circuit's definition of social group"). To the extent Huezo proposes a new social

3

group in his petition for review, we lack jurisdiction to consider it. 8 U.S.C. § 1252(d)(1).

3.　　"To qualify for CAT relief, an alien must establish that 'it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014) (quoting 8 C.F.R. § 208.16(c)(2)). "Past torture is the first factor we consider in evaluating the likelihood of future torture because past conduct frequently tells us much about how an individual or a government will behave in the future." *Nuru v. Gonzales*, 404 F.3d 1207, 1217 (9th Cir. 2005). "[I]f an individual has been tortured and has escaped to another country, it is likely that he will be tortured again if returned to the site of his prior suffering, unless circumstances or conditions have changed significantly, not just in general, but with respect to the particular individual." *Id.* at 1217–18.

The IJ found that it was not "more likely than not that [Huezo] would be harmed at all if returned to El Salvador," and denied Huezo's CAT claim. The IJ also found that Huezo "did not establish that any harm done by gang members would be with the acquiescence of the El Salvador government." We conclude the record compels a contrary conclusion.

When Huezo was about thirteen years old, gang members in El Salvador cut his throat when he refused to do something they wanted him to do. Huezo nearly

4

died as a result of the attack, and a stent was placed in his throat. Only a few days later, gang members shot and robbed Huezo's father after his father intervened to keep Huezo out of harm's way. Though the IJ found that Huezo "began sporting a number of gang-related tattoos" while in El Salvador, Huezo's unchallenged testimony was that gang members forcibly tattooed him. When Huezo was seventeen, after he was implicated in and exonerated of a murder, a vigilante group called the Black Shadow broadcast his name over the radio and threatened to kill him if he did not leave El Salvador. Huezo then fled El Salvador for the United States.

"[U]nless circumstances or conditions have changed significantly, not just in general, but with respect to the particular individual," it is likely that a person who has suffered past torture "will be tortured again if returned to the site of his prior suffering." *Nuru*, 404 F.3d at 1217–18. There is no evidence in the record that country conditions have changed. Current country-conditions evidence shows that extrajudicial killings of suspected gang members are one of the "most significant human rights issues" in El Salvador. Indeed, this court has frequently noted the dire conditions in El Salvador. *See, e.g.*, *J.R. v. Barr*, 975 F.3d 778, 783 (9th Cir. 2020) (noting country-conditions evidence that "El Salvador became the most homicidal nation . . . in the world not at war" and that "in many neighborhoods,

5

armed groups and gangs targeted certain persons . . . and created a climate of fear that the authorities were not capable of restoring to normal" (internal quotation marks and alteration omitted)); *Parada v. Sessions*, 902 F.3d 901, 916 (9th Cir. 2018) (noting reports of "rampant violence and murder" perpetrated by gangs in El Salvador (internal quotation marks omitted)). In response to Huezo's credible testimony that Salvadoran police officers force suspected gang members to remove their shirts to expose any tattoos, and then use the tattoos as justification for extrajudicial killings, the IJ stated "it seems reasonable to believe that [Huezo] would be able to explain to the officers that he was a member of MS-13 as a young man and is no longer active with that gang." There is no evidence in the record to support the IJ's speculation that police would accept such an explanation. Country-conditions reports confirm that "[i]n an attempt to eradicate gangs, the Salvadoran government has *de facto* sanctioned extrajudicial killings," and "investigation[s] revealed that police and military officers [have] committed extrajudicial executions" in an attempt to fight gangs.

The IJ's supposition that Huezo will not face danger in El Salvador is further undermined by evidence that Huezo himself has continued to be recognized as a former gang member since his name was broadcast over the radio, and country conditions have therefore not significantly changed regarding Huezo in particular.

*See Nuru*, 404 F.3d at 1217–18. The IJ found that Huezo's "case is weakened [] by the passage of time" because Huezo had "not spent any appreciable time in El Salvador since the mid- to late 1990s," and asserted that "[i]t is very clear that 40-year-olds are viewed by society much differently than 18-year-olds are." But the evidence does not support the statement that 40-year-olds are treated differently, and the IJ failed to grapple with evidence that in 2017, after Huezo was removed from the United States to El Salvador, a government official at the arrival facility in El Salvador told Huezo that if he walked out of the facility he would be killed by the 18th Street gang, a rival gang to MS-13. The official told Huezo that if someone tried to kill him, Huezo would not be permitted to reenter the facility. Huezo took a bus from the facility to his father's house, where he hid for one month before returning to the United States. Back in the United States, while Huezo was detained, he met with a Salvadoran consulate official and overheard the official inform a different detainee that Huezo should be worried about returning to El Salvador because Huezo was "the bad guy, he's the gang member."

The pattern established by this evidence compels the conclusion that it is more likely than not Huezo will be tortured by or with the acquiescence of a government official if he is removed to El Salvador. Accordingly, we remand with instructions to grant CAT relief.

**PETITION DISMISSED IN PART, DENIED IN PART, GRANTED IN PART, AND REMANDED.**