# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2730

FRANSISCA INGMANTORO,

*Petitioner*,

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A98-505-578

ARGUED SEPTEMBER 10, 2008—DECIDED DECEMBER 18, 2008

Before COFFEY, RIPPLE and MANION, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Fransisca Ingmantoro, a citizen of
Indonesia, entered the United States as a temporary
visitor and overstayed her visa. She filed an application
for asylum, withholding of removal and protection
under the Convention Against Torture ("CAT"). The
immigration judge ("IJ") denied Ms. Ingmantoro's ap-
plication, finding that she could show neither past per-
secution based on her status as a Christian of Chinese

descent nor a well-founded fear of future persecution. She appealed to the Board of Immigration Appeals ("BIA"), and the BIA affirmed. Ms. Ingmantoro then petitioned this court for review. Because the rulings of the BIA and the IJ are supported by substantial evidence, we deny the petition for review.

# I

## BACKGROUND

Although Ms. Ingmantoro was born in Indonesia, she is of Chinese descent. Ms. Ingmantoro is a Christian; while in Indonesia, she attended a Pentecostal church and Catholic schools. Her family lived in a predominantly Chinese area in Probolinggo, but her father owned a store in an ethnically mixed part of the city. At the hearing on the merits of her requests, Ms. Ingmantoro testified that native Indonesian Muslims often visited the store and demanded protection payments. She testified that her father reported these demands to the authorities. In addition, she testified that police visited the store, but did nothing further.

Ms. Ingmantoro also testified that, in 1999, she left Probolinggo to attend college in Surabaya. Because Surabaya was about three hours away by car, she often would return home on the weekends. She became involved in Christian charity work through the college, and, during school vacations, she participated in similar charity work with her family's church in Probolinggo. She further testified that, in response to her work with Christian

charities, some ethnic Indonesian Muslims began making threatening calls to her parents and visiting her father's store to ask for her. She testified to her belief that these men objected to her charity work because they thought it involved proselytizing. She stated that, because of the threatening calls and visits, she stayed in Surabaya during the first half of 2003 and did not return home on weekends. When she eventually returned home in August 2003, the men who had been looking for her returned to her father's store. She heard the men shouting her name and fled through the store's back door. After she left, the men burned down the store. Ms. Ingmantoro, her father and store employees all reported the incident to the police. Although the police report stated that Ms. Ingmantoro had been bruised, she testified that she suffered no physical harm in the incident.

Ms. Ingmantoro further testified that, after the store burned down, her family left Probolinggo for Surabaya and then went to Malang, where Ms. Ingmantoro's grandmother lived. After a month in Malang, Ms. Ingmantoro's family moved to Denpaser, on the island of Bali, where they were living at the time of the hearing before the IJ.[1] Ms. Ingmantoro testified that, at the time of the hearing, her parents still were receiving threatening phone calls from anonymous individuals asking if they were Chinese and if they were Christian. Although they were considering moving to other parts of Indonesia, they

---

[1] Probolinggo, Surabaya and Malang are all on the island of Java.

believed that they would suffer the same types of harassment no matter where they moved. Ms. Ingmantoro testified that, if she returned to any part of Indonesia, the men who had been looking for her might find her and kill her.

Ms. Ingmantoro entered the United States in October 2003 as a nonimmigrant temporary visitor for pleasure. Although her visa expired on April 22, 2004, she remained in the United States. In September 2004, Ms. Ingmantoro applied for asylum and withholding of removal based on her race and her religion. Her application was denied. She then appeared before an IJ, conceded her removability and renewed her application for asylum, withholding of removal and relief under the CAT.

The IJ denied the application. He accepted Ms. Ingmantoro's testimony as true but held that the events she described were not sufficiently severe to constitute past persecution. As the IJ understood the evidence, Ms. Ingmantoro had "little difficulty growing up" and "suffered no real harm at all because of her ethnic Chinese background and her religion." A.R. at 27-28. The IJ found that Ms. Ingmantoro suffered no harm in the incident at her father's store and that the harm suffered by her father was not very great; her father was able to relocate to another city in Indonesia and is considering starting a new business. The IJ also questioned Ms. Ingmantoro's explanation as to why the men were looking for her in the first place and held that she had not demonstrated that she would be harmed if she returned to Indonesia.

In addition, the IJ held that Ms. Ingmantoro had failed to show that the Indonesian government was unwilling or unable to prevent the threats and violence against her. The IJ concluded that, given the general conditions in Indonesia, Ms. Ingmantoro had not demonstrated a well-founded fear of future persecution. Finally, the IJ denied her requests for withholding of removal and CAT relief.

Ms. Ingmantoro appealed to the BIA, which affirmed on all grounds. In addition, the BIA concluded that, even if Ms. Ingmantoro had demonstrated a threat of persecution, she had failed to show that the threat existed in all parts of Indonesia.

## II

### DISCUSSION

Ms. Ingmantoro submits that the BIA erred in denying her application for asylum and that she has met her burden for establishing both a claim for withholding of removal and a claim for CAT relief. We review the IJ's decision, as supplemented by the BIA's opinion. *See Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008).[2] We shall uphold the denial of relief if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502

---

[2] We review the IJ's decision dismissing the petition, as supplemented by the BIA's decision denying the petitioner's motion to reopen, because the BIA relied on the IJ's conclusion when it dismissed the petitioner's appeal.

U.S. 478, 481 (1992). In other words, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Elias-Zacarias*, 502 U.S. at 483-84; *Chatta v. Mukasey*, 523 F.3d 748, 752 (7th Cir. 2008).

An asylum applicant who proves past persecution is entitled to a rebuttable presumption that she has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *see also Haxhiu v. Mukasey*, 519 F.3d 685, 690 (7th Cir. 2008). Ms. Ingmantoro first submits that her testimony, which the IJ credited, and the evidence she presented establish past persecution. She contends that she was the real target of the men who burned down her father's store. We have defined persecution as the " 'punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate.' " *Zeqiri v. Mukasey*, 529 F.3d 364, 370 (7th Cir. 2008) (quoting *DeSouza v. INS*, 999 F.2d 1156, 1158 (7th Cir. 1993)).

The IJ rejected Ms. Ingmantoro's past-persecution claim because she did not suffer any harm in the incident at her father's store and because she could not claim derivative persecution from the harm suffered by her father. At the outset, we have significant reservations as to whether this claim can be characterized as "derivative." In a derivative claim, the petitioner typically is seeking relief because she has shared in the harm leveled at

a family member who is the target of persecution.[3] By contrast, the men who burned down her father's store did so in the course of looking for Ms. Ingmantoro. Ms. Ingmantoro's evidence goes beyond simply showing that she shared the harm of persecution leveled against a family member. She claims that *she* was the target. We nevertheless cannot say, on this record, that the harm suffered by Ms. Ingmantoro rose to the level of persecution. We also agree with the IJ that Ms. Ingmantoro presented a very thin case that the men who were looking for her were doing so because of her Christian charity work, much of which was done in a town three hours away by car. *Cf. Aid v. Mukasey*, 535 F.3d 743, 748 (7th Cir. 2008) (holding that applicant had failed to show that his harassers were motivated by his political opinion because he presented no evidence that his attackers were politically motivated). The record does not contain substantial evidence of the requisite causal connection.

Even if Ms. Ingmantoro could overcome those obstacles, she cannot overcome the rule that "[t]he acts of private citizens do not constitute persecution unless the government is complicit in those acts or is unable or unwilling to take steps to prevent them." *Chakir v. Gonzales*, 466 F.3d 563, 570 (7th Cir. 2006). Ms. Ingmantoro presented no evidence connecting her attackers to the government. *See Chatta*, 523 F.3d at 753 (concluding that

---

[3] *See Mabasa v. Gonzales,* 455 F.3d 740, 746 (7th Cir. 2006); *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir. 2000); *Tamas-Mercea v. Reno,* 222 F.3d 417, 424 (7th Cir. 2000).

the petitioner, a Sunni Muslim, had not demonstrated that the government had perpetrated or condoned the alleged religious persecution, in part because the majority of the country's population was Sunni); *Garcia v. Gonzales*, 500 F.3d 615, 618 (7th Cir. 2007) (denying the petition because the petitioner lacked a well-founded belief that the Colombian government would be unwilling or unable to protect him from future private persecution, when the government had protected him in the past and there was no indication it could not do so in the future). Far from testifying that the men were government actors, Ms. Ingmantoro testified that she was targeted by members of a Muslim "organization" or "institution." A.R. at 124, 131. Ms. Ingmantoro also testified that, after her father reported the requests for protection payments, police visited the store; the fact that they made no arrests does not necessarily indicate that the authorities were unable or unwilling to prevent any further abuse.[4] Notably, Ms. Ingmantoro presented no evidence suggesting that the police refused to respond to the reports filed after her father's store was destroyed; the fact that the police did not prevent that harm on one occasion does not compel a finding that they generally were unable or unwilling to prevent it. *Cf. Guchshenkov v. Ashcroft*, 366 F.3d 554, 557-58 (7th Cir. 2004)

---

[4] The police in this case did take some action in response to the report. *Cf. Pramatarov v. Gonzales*, 454 F.3d 764, 766 (7th Cir. 2006) (noting that there was some evidence of government complicity when police refused to take action in response to an attack on the petitioner).

(attributing private conduct to government where police responded to petitioner's assault report by saying they had "more important things to take care of"). Thus, the IJ and the BIA's conclusion that Ms. Ingmantoro was not persecuted is supported by substantial evidence. On this record, we cannot say that Ms. Ingmantoro established that she was subject to past persecution.

Even though Ms. Ingmantoro failed to show past persecution, she still may qualify for asylum if she can demonstrate a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(2); *Oryakhil*, 528 F.3d at 998. A well-founded fear of future persecution has both a subjective and an objective component. *Garcia*, 500 F.3d at 618. Ms. Ingmantoro argues that she has satisfied the objective component by showing a pattern or practice of persecuting ethnic Chinese Christians in Indonesia. *See* 8 C.F.R. § 208.13(b)(2)(iii)(A); *Ahmed v. Gonzales*, 467 F.3d 669, 674 (7th Cir. 2006).

The Government argues that Ms. Ingmantoro's pattern-or-practice argument is foreclosed by our holding in *Kaharudin v. Gonzales*, 500 F.3d 619, 624 (7th Cir. 2007). In that case, the record did not demonstrate that ethnic Chinese Christians were subject to a pattern or practice of persecution in Indonesia. As a general matter, our holding in one fact-specific case does not bind us in another fact-specific case when the two cases have different records. *See Pavlovich v. Gonzales*, 476 F.3d 613, 618 n.3 (8th Cir. 2007). *Kaharudin* therefore is not dispositive. In *Kaharudin*, we simply held that the record did not establish that the Indonesian government was complicit in

or was unwilling or unable to prevent private acts of violence against Chinese Christians. *Kaharudin*, 500 F.3d at 624. We must reach the same conclusion on this record.

To constitute a pattern or practice of persecution, the persecution of a protected group must be a "systematic, pervasive, or organized effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetrated or tolerated by state actors." *Mitreva v. Gonzales*, 417 F.3d 761, 765 (7th Cir. 2005) (internal quotation and citation omitted). Ms. Ingmantoro states that there was "overwhelming" evidence of a pattern or practice of persecution against Chinese Christians in Indonesia, but she provides no authority for this statement. The Country Report on Human Rights Practices[5] and the International Religious Freedom Report,[6] both of which the IJ placed in the record, recount a number of serious abuses of ethnic Chinese Christians in Indonesia; these reports do not establish, however, a pattern or practice of persecution tolerated by or perpetrated by the Indonesian government.

Our holding that Ms. Ingmantoro has failed to show a pattern or practice of persecution of ethnic Chinese Christians in Indonesia does not decide the issue in future

---

[5] U.S. Dept. of State, *Indonesia: Country Reports on Human Rights Practices—2004* (Feb. 28, 2005), http://www.state.gov/g/drl/rls/hrrpt/2004/41643.htm (last visited Oct. 15, 2008).

[6] U.S. Dept. of State, *Indonesia: International Religious Freedom Report 2005* (Nov. 8, 2005), http://www.state.gov/g/drl/rls/irf/2005/51512.htm (last visited Oct. 15, 2008).

cases. Later petitioners may develop different records and careful scrutiny of the issue by the court and counsel will be necessary in future cases. Indeed, in the future, better information on human rights conditions may become available or conditions in Indonesia may worsen.

The IJ and the BIA addressed Ms. Ingmantoro's pattern-or-practice claim, and we expressly have adopted a high standard for such claims. *See Ahmed*, 467 F.3d at 675 (denying petition where the applicant failed to satisfy "the objectively reasonable standard applicable in 'pattern or practice' persecution cases," because he did not demonstrate "a systematic, pervasive, or organized effort to kill, imprison, or severely injure" Midgan clan members).[7]

---

[7] Ms. Ingmantoro's reliance on three cases from our sister circuits to support her pattern-or-practice claim is misplaced. One case was reversed after an en banc rehearing. *Lolong v. Gonzales*, 400 F.3d 1215 (9th Cir. 2005), *rev'd*, 484 F.3d 1173 (9th Cir. 2007). The second case analyzed whether the applicant was entitled to removal because she was a member of a "disfavored group," *Sael v. Ashcroft*, 386 F.3d 922 (9th Cir. 2004); however, we have declined to adopt the disfavored group analysis, which is less stringent than the analysis adopted by this court. *See Kaharudin v. Gonzales*, 500 F.3d 619, 625 (7th Cir. 2007) (Although "[t]he Ninth Circuit has deemed ethnic Chinese a disfavored group in Indonesia . . . . We previously have considered and rejected the application of the Ninth Circuit's 'disfavored group' analysis in the context of withholding removal, and we decline to revisit the issue in this case."); *Firmansjah v. Gonzales*, 424 F.3d 598, 607 n.6 (7th Cir. 2005) (noting that *Sael v. Ashcroft*, 386 F.3d 922 (9th Cir. 2004), did not

(continued...)

The IJ's conclusion that Ms. Ingmantoro failed to demonstrate past persecution and failed to establish that the Indonesian government was unwilling or unable to protect her from the threats of private individuals is supported by substantial evidence. Therefore, the IJ properly denied Ms. Ingmantoro's petition.

Because Ms. Ingmantoro has not established that she qualifies for asylum, she cannot meet the more stringent test for withholding of removal. *See Soumare v. Mukasey*, 525 F.3d 547, 552 (7th Cir. 2008). To establish eligibility for withholding of removal, Ms. Ingmantoro must show that " 'it is more likely than not that [she] would be subject to persecution' in the country to which [she] would

---

[7] (...continued)

aid the petitioner's case, because "[n]ot only was *Sael* considering a standard that was less stringent on its face, but *Sael* required an even lower level of individualized risk after finding that the applicants were members of a 'disfavored group.' This circuit has not recognized a lower threshold of proof based on membership in a 'disfavored group.' "); *accord Lie v. Ashcroft*, 396 F.3d 530, 538 n.4 (3d Cir. 2005) ("We disagree with the Ninth Circuit's use of a lower standard for individualized fear absent a 'pattern or practice' of persecution and, similarly, we reject the establishment of a 'disfavored group' category."). Ms. Ingmantoro also points to a case in which the Second Circuit remanded a pattern-or-practice claim of an Indonesian Christian. *Mufied v. Mukasey*, 508 F.3d 88 (2d Cir. 2007). However, in *Mufied*, the IJ and the BIA had failed to address the pattern-or-practice claim, and the Second Circuit chose not to address it because it had doubts about the BIA's standard for such claims. *Id.* at 91-93.

be returned." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (quoting *INS v. Stevic*, 467 U.S. 407, 429-30 (1984)) (discussing the clear probability standard under Section 243(h) of the Immigration and Nationality Act); *see also Tariq v. Keisler*, 505 F.3d 650, 656 (7th Cir. 2007) ("To establish a clear probability of persecution, the applicant must demonstrate that it is more likely than not that [the applicant] would be subject to persecution in the country to which [the applicant] would be returned." (internal quotation and citation omitted)). Ms. Ingmantoro has failed to do so here. Similarly, she has failed to show that it is more likely than not that she would be tortured if returned to Indonesia, so her request for CAT relief fails as well. *See* 8 C.F.R. §§ 208.16(c), 208.18; *LaGuerre v. Mukasey*, 526 F.3d 1037, 1040 (7th Cir. 2008).

## Conclusion

For the reasons set forth in this opinion, we deny the petition.

PETITION FOR REVIEW DENIED

12-18-08