# In the
# United States Court of Appeals
# For the Seventh Circuit

_____

No. 12-3858

YOHAN BYLLY SALIM,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney
General of the United States,

*Respondent*.

_____

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A078-597-192

_____

ARGUED MAY 28, 2013 — DECIDED AUGUST 28, 2013

_____

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and
HAMILTON, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Petitioner Yohan Bylly Salim, an
Indonesian citizen, fled his homeland in 2000 and came to
the United States. He sought asylum, withholding of remov-
al, and relief under the Convention Against Torture on the
ground that he endured several instances of harassment and

discrimination as an ethnic Chinese Christian living in Indonesia. The Immigration Judge (IJ) denied all forms of requested relief because Salim had failed to show past or future persecution. Salim filed a motion to reopen the proceedings and the IJ denied it. Salim appealed the IJ's denial of his motion to reopen, but the Board of Immigration Appeals (BIA) dismissed the appeal because Salim offered no new, previously unavailable evidence and he relied on case law from outside this circuit. Salim now seeks review of the BIA's order denying his motion to reopen. Because Salim's motion to reopen did not point to any evidence that was previously undiscoverable, we conclude that the BIA's decision did not constitute an abuse of discretion. Therefore, we deny the petition for review.

## I. BACKGROUND

Salim is an Indonesian citizen of Chinese ethnicity and Christian faith. While living in Indonesia as a teenager, Salim attended private Christian schools but says he endured ongoing harassment from Muslim students at some of the nearby public schools because of his Chinese ethnicity. He was robbed by students from nearby schools for his lunch money several times, and once a student with a knife threatened him and punctured his neck. Salim also claims it was difficult for Chinese individuals and Christians to travel safely around Jakarta during the period of intense rioting in 1998. He recounts that a number of Chinese businesses were burned down during that time, though his family's business was not harmed.

Salim left Indonesia as a young adult in 2000 and filed a timely application for asylum, withholding of removal, and protection under the Convention Against Torture. His appli-

cation was denied. He then appeared before an IJ, conceded his removability, and renewed his application for asylum. At a January 2004 hearing before the IJ, Salim testified that he suffered harassment in Indonesia based on his ethnicity and religion. The IJ found that his testimony was not credible and denied the application. Salim appealed to the BIA.

The BIA found that the IJ's decision was not adequately supported and remanded the case so that Salim could submit additional evidence of conditions in Indonesia. Salim appeared for a final hearing before a different IJ in February 2010. Salim's attorney did not present any new evidence of conditions in Indonesia, but the government presented the United States Department of State's 2008 Country Report on Human Rights Practices in Indonesia. After considering all of the evidence, the IJ found Salim's testimony truthful, but nevertheless concluded that the facts of Salim's case did not rise to the level of past persecution. In the IJ's view, the times Salim was threatened and robbed by other students on his way to and from school appeared to be random acts of violence. The IJ also concluded that Salim had failed to establish a well-founded fear of future persecution. Salim did not present any evidence suggesting that he would be singled out individually for persecution if returned to Indonesia, and even though general discrimination against ethnic and religious minorities in Indonesia still exists, the IJ noted that instances of harassment against Chinese people were on the decline.

Salim did not appeal the IJ's decision, but filed a motion to reopen his proceedings. In support of his motion, he filed over twenty articles about religious tension in Indonesia and argued that he should qualify for asylum under Ninth Cir-

cuit case law because he is a member of two "disfavored groups" in Indonesia: ethnic Chinese people and Christians. The IJ denied the motion, concluding that Salim's motion was "nothing more than a late attempt to submit additional background information on conditions in Indonesia and a legal argument that has been rejected by the Seventh Circuit Court of Appeals." Salim then appealed the denial of his motion to reopen to the BIA. The BIA dismissed the appeal, concluding that Salim failed to present any new evidence that was previously unavailable or undiscoverable at his former hearing. This petition for review followed.

## II. ANALYSIS

Salim contends on appeal that the BIA's denial of his motion to reopen the proceedings constituted an abuse of discretion. To prevail on a motion to reopen, a petitioner must point to new evidence that "is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1); *see Selimi v. Ashcroft*, 360 F.3d 736, 739 (7th Cir. 2004). The BIA has broad discretion in deciding whether to grant a motion to reopen, and we will uphold the BIA's decision unless it was "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Awad v. Ashcroft*, 328 F.3d 336, 341 (7th Cir. 2003).

### A. No New Evidence Presented

To support his motion to reopen, Salim submitted numerous news articles in an attempt to show the extent of discrimination against Chinese Christians in Indonesia. But the problem for Salim is that he cannot show that any of this ev-

idence was previously unavailable. As the BIA pointed out, all but three of the many articles he submitted with his motion were dated before February 23, 2010 (the date of the final hearing before the IJ). *See Kucana v. Holder*, 603 F.3d 394, 396–97 (7th Cir. 2010) (explaining that "[o]nly evidence that could *not* have been presented earlier supports a motion to reopen … and then only to show that risk has increased because of changes in country conditions"). And while three articles that post-dated his hearing show continuing inter-religious tensions in Indonesia, they do not demonstrate new or changed circumstances suggesting that the government of Indonesia is now unwilling or unable to protect Salim against the type of harassment of which he complains. *See Ingmantoro v. Mukasey*, 550 F.3d 646, 650 (7th Cir. 2008) ("[T]he acts of private citizens do not constitute persecution unless the government is complicit in those acts or is unable or unwilling to take steps to prevent them.") (citation omitted).

Salim further argues that the BIA failed to consider a Ninth Circuit case, *Tampubolon v. Holder*, 610 F.3d 1056 (9th Cir. 2010), as "new and material case law" in evaluating his motion. The petitioners in that case, Protestant Christians, maintained that they should qualify for withholding of removal because they had a well-founded fear of future persecution if returned to Indonesia. They argued that Christians are a "disfavored group" in Indonesia, subject to severe discrimination and violence, and that their membership in that group made it more likely than not that they would be singled out individually for persecution on account of their religion. *See* 8 C.F.R. § 1208.16(b)(2). The Ninth Circuit agreed. The court explained that "[e]vidence of both individual and group targeting are relevant to demonstrate the likelihood

that a particular individual will be persecuted. Therefore, the more evidence of group targeting an … applicant proffers, the less … individually specific evidence she needs." 610 F.3d at 1062 (citing *Wakkary v. Holder*, 558 F.3d 1049, 1062–64 (9th Cir. 2009)). According to Salim, *Tampubolon* constituted "new evidence" since it was issued after his February 2010 hearing before the IJ and it was the first case to explicitly hold that Christians in Indonesia are a disfavored group. Unfortunately for Salim, *Tampubolon* does not help him for several reasons.

As an initial matter, a change in case law is not considered new "evidence" for purposes of a motion to reopen. *Mungongo v. Gonzales*, 479 F.3d 531, 534 (7th Cir. 2007). It is a motion for reconsideration, as opposed to a motion to reopen, that asks the agency to consider a change in the law. *See Victor v. Holder*, 616 F.3d 705, 709 (7th Cir. 2010) (explaining that a motion to reconsider "asks the BIA to revisit its decision in light of additional legal arguments, a change of law, or an argument that was overlooked earlier," whereas "a motion to reopen does not take issue with the BIA's decision at the time it was entered, but instead asks the BIA to re-examine its opinion in light of evidence that was unavailable at the time of the original opinion").

But more importantly, the "disfavored group" analysis used in asylum and withholding of removal cases in the Ninth Circuit is also not "new" or a change in the law. This approach dates back to at least 1994 in the asylum context. *See Kotasz v. INS*, 31 F.3d 847, 853 (9th Cir. 1994); *see also Sael v. Ashcroft*, 386 F.3d 922, 927 (9th Cir. 2004) (finding Indonesia's ethnic Chinese minority a disfavored group). And the Ninth Circuit's decision in *Wakkary v. Holder* (which recog-

nized that Chinese Christians—like Salim—are disfavored in Indonesia), held that this mode of analysis is applicable in the withholding of removal context as well. 558 F.3d at 1063–64. In other words, it is not as if the IJ and BIA did not have the benefit of a fully developed body of Ninth Circuit case law on this issue when evaluating Salim's claims. The fact that the Ninth Circuit had not yet definitively said that Christians (who are not Chinese) are also considered a disfavored group until June 2010 in *Tampubolon* is beside the point—the *approach* being used to evaluate these claims existed well before Salim's February 2010 hearing, and Salim could have invoked it.

## B. Disfavored Group Approach Does Not Apply

Both the IJ and BIA found *Tampubolon* unhelpful to Salim's case not only because it was not evidence and did not offer anything new, but also because the disfavored group analysis used in the Ninth Circuit has been expressly rejected by our circuit. Indeed, several of our cases have rejected this approach on the grounds that it is a "less stringent" test. *See Ingmantoro*, 550 F.3d at 652 n.7 (citing cases); *Kaharudin v. Gonzales*, 500 F.3d 619, 625 (7th Cir. 2007) (noting that while "[t]he Ninth Circuit has deemed ethnic Chinese a disfavored group in Indonesia, … [w]e previously have considered and rejected the application of the Ninth Circuit's 'disfavored group' analysis in the context of withholding removal, and we decline to revisit the issue in this case."); *Firmansjah v. Gonzales*, 424 F.3d 598, 607 n.6 (7th Cir. 2005) ("This circuit has not recognized a lower threshold of proof based on membership in a 'disfavored group.'"). In light of the controlling precedent in this circuit, the BIA did not abuse its discretion in declining to apply *Tampubolon*.

Salim nevertheless invites us to use his case as an opportunity to reverse course and hold that the disfavored group analysis does not create a new test or lower a petitioner's burden of proof, but rather simply uses an evidentiary standard that falls within the established framework of proving a well-founded fear of future persecution in both asylum and withholding of removal cases. Given that Salim never appealed the IJ's February 2010 decision on the merits, we decline the invitation.

But the central question of whether the Ninth Circuit's disfavored group approach actually differs from our circuit's analysis of these cases in a meaningful way remains. In both the asylum and withholding of removal context, an applicant may be eligible for relief if he can demonstrate a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(2) (using "reasonable possibility" standard in asylum context); 8 C.F.R. § 208.16(b)(2) (using "more likely than not" standard in withholding of removal context). A probability of future persecution may be established by either one of two methods. Under one method, the applicant must show that "there is a pattern or practice" of persecution against a group of persons "similarly situated" to the applicant on account of a protected ground, and that "his or her own inclusion in and identification with such group of persons" makes it "reasonable" or "more likely than not" that his or her life or freedom would be threatened upon return to that country. 8 C.F.R. §§ 208.13(b)(2)(iii), 208.16(b)(2)(i)–(ii). We have said before that in order to use the "pattern or practice" method, "the persecution of a protected group must be a systematic, pervasive, or organized effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetuated or tolerated by state actors."

*Ingmantoro*, 550 F.3d at 651 (citation and internal quotation marks omitted); *see also Banks v. Gonzales*, 453 F.3d 449, 452–53 (7th Cir. 2006) (recognizing that member of persecuted ethnic and political party had reasonable fear of future persecution in light of pattern or practice of persecution). Salim does not raise such a claim here.

The second, alternative method of finding future persecution calls for an individualized assessment of the risk of harm. Under this method, an applicant must show that there is a reasonable possibility (in the asylum context) or that it is more likely than not (in the withholding of removal context) that he will be "singled out individually" for persecution if forced to return home. 8 C.F.R. §§ 208.13(b)(2), 208.16(b)(2); *see also Munoz-Avila v. Holder*, 716 F.3d 976, 982–83 (7th Cir. 2013) (reiterating that "the level of overall danger in a country is not a sufficient basis to find persecution, and that a petitioner must demonstrate that he or she is likely to be singled out"). This is where the Ninth Circuit's disfavored group analysis comes into play. That court has defined a disfavored group as a "group of individuals in a certain country or part of a country, all of whom share a common, protected characteristic, many of whom are mistreated, and a substantial number of whom are persecuted, but who are *not* threatened by a pattern or practice of systematic persecution." *Tampubolon*, 610 F.3d at 1060 (citing *Wakkary*, 558 F.3d at 1052, 1062) (emphasis added). The idea is that belonging to a disfavored group is relevant to demonstrating an individualized risk of persecution because "one's chances of being singled out from the general population and subjected to persecution is often strongly correlated with the frequency with which others who share the same disfavored characteristic are mistreated and persecuted." *Wakkary*, 558 F.3d at

1063; *see also id.* at 1064 ("In other words, when asking how likely it is that an individual applicant will be 'singled out' in the future on the basis of his group membership, it is indisputably relevant … how others in his group are treated.").

In theory, one could view the Ninth Circuit's approach on this score as a simple recognition that group membership matters, as it is "an aspect of nearly all asylum claims, not a special problem limited to pattern or practice cases." *See Kotasz v. INS*, 31 F.3d 847, 853 (9th Cir. 1994). And the INS regulations clearly "contemplate the effect of group membership on an individual's circumstances by enumerating the five statutory categories of withholding eligibility." *Kho v. Keisler*, 505 F.3d 50, 55 (1st Cir. 2007). But this approach has led to significant disagreement among the circuits because it invites one to question what exactly it seeks to add to the existing regulatory regime that is not already covered under the "pattern or practice" theory of persecution. In practice, the Ninth Circuit appears to be using a sliding-scale approach to find "the more serious and widespread the threat to the [disfavored] group in general, the less individualized the threat of persecution needs to be." *Sael*, 386 F.3d at 925. In *Sael*, the record showed significant discrimination against Chinese minorities in Indonesia, but this mistreatment did not rise to the level of a "pattern or practice" of persecution. *Id.* at 929. However, the petitioner did successfully demonstrate "the general persecution of ethnic Chinese, sufficient to characterize their status as 'disfavored' in Indonesia," *id.*, and so she only had to establish a "comparatively low level of individualized risk in order to prove that she has a well-founded fear of future persecution." *Id.* at 927; *see also Wakkary*, 558 F.3d at 1064. Essentially, this approach serves as a

safety net for those who fall short of establishing a pattern of practice of persecution, but have shown membership in a historically mistreated group. *See Kho*, 505 F.3d at 55 ("A group may be deemed 'disfavored' on the basis of evidence of mistreatment that is less pervasive and less severe than that required to establish a pattern or practice of persecution.").

Though we often discuss a petitioner's membership in a particular group in the context of assessing an individualized threat of future persecution, *see Escobar v. Holder*, 657 F.3d 537, 549 (7th Cir. 2011), we have never held that a petitioner may put forth *less* evidence of individualized persecution simply by virtue of belonging to a disfavored group. *See, e.g., Zhou Ji Ni v. Holder*, 635 F.3d 1014, 1020 (7th Cir. 2011) (denying petition for review where evidence of country conditions regarding Chinese repression of Christianity were "untethered from facts establishing an individualized risk of persecution"). Instead, we have always required a petitioner to show "specific, detailed facts supporting the reasonableness of [his] fear that [he] will be singled out for persecution." *Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir. 1999) (citing cases). In reality, the disfavored group approach in the Ninth Circuit may yield similar or even identical results. *See, e.g., Halim v. Holder*, 590 F.3d 971, 978–79 (9th Cir. 2009) (denying petition for review where petitioner failed to make the "minimal showing" of individual targeting). But to the extent that the Ninth Circuit uses "a lower standard for individualized fear absent a 'pattern or practice' of persecution," *Lie v. Ashcroft*, 396 F.3d 530, 538 n.4 (5th Cir. 2005), we must join other circuits that have rejected the disfavored group approach. *See id.; Kho*, 505 F.3d at 55; *Wijaya v. Gonzales*, 227 Fed. Appx. 35, 38 n.1 (2d Cir. 2007) (summary order).

Here too, Salim presented no new evidence on reopening to show his individualized risk of future persecution, and, therefore, the disfavored group approach would not have helped him in any event.

### III. CONCLUSION

The petition for review is DENIED.