In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1024

SUGIARTO HALIM,

*Petitioner*,

*v.*

ERIC H. HOLDER, Attorney General of
the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A098-919-014

ARGUED MAY 23, 2014 — DECIDED JUNE 17, 2014

Before BAUER and EASTERBROOK, *Circuit Judges*, and ST. EVE,
*District Judge.*[*]

BAUER, *Circuit Judge.* Sugiarto Halim, an Indonesian citizen,
came to the United States in 2000 and overstayed his tempo-
rary visa. He filed for asylum, withholding of removal, and

---

[*] The Honorable Amy J. St. Eve, of the United States District Court for the
Northern District of Illinois, sitting by designation.

protection under the Convention Against Torture ("CAT") stating that he feared he would be persecuted if he were sent back to Indonesia due to his status as a Chinese Christian. The Immigration Judge ("IJ") denied Halim's application for asylum because he failed to apply within the one-year statutory limit, and denied Halim's other requests for relief because he failed to show past persecution or establish a well-founded fear of future persecution. Halim appealed to the Board of Immigration Appeals ("BIA"); it affirmed the IJ's decision and dismissed the appeal. Halim now petitions this court for review of his application for withholding of removal. We conclude that the orders of the IJ and BIA are supported by substantial evidence and deny Halim's petition.

## I. BACKGROUND

Halim, a native and citizen of Indonesia, came to the United States on a visa in March 2000, and was authorized to stay for six months. After his visa expired, he stayed in the United States without applying for any type of legal residency. In 2005, the Department of Homeland Security detained Halim and initiated removal proceedings against him for overstaying his visa in violation of 8 U.S.C. § 1227(a)(1)(B).

Halim sought asylum, withholding of removal proceedings under § 241(b)(3) of the Immigration and Nationality Act, and protection under the CAT. Halim contended that if he was forced to return to Indonesia, he would be subject to persecution because of his Chinese ethnicity and Christian beliefs.

In his removal proceedings, Halim testified about discrimination he and his family faced in Indonesia due to their Chinese descent. Halim testified that because his sister was

earlier denied enrollment in an Indonesian university, he speculated that he would be rejected as well. Therefore, he left his hometown of Medan in 1988 to attend university in Germany.

On a trip home to visit his family in 1994, Halim witnessed a riot fueled by ethnic and labor issues. The riot targeted Chinese-owned stores and was at a shopping mall where his sister owned a store. Halim and his sister were not injured and the rioters did not enter or damage his sister's store.

In 1998, violent racial riots targeting people of Chinese ethnicity broke out again throughout Indonesia. In Halim's hometown of Medan, rock-throwing rioters swarmed the streets in his family's neighborhood. Halim's family members were not targeted or injured in the riot. At the time, Halim was in Germany.

Additionally, Halim recounted several occasions when he thought that he was harassed because of his ethnicity. He claimed that when he traveled from Germany to Medan, Indonesian airport personnel took his passport, searched his luggage, and demanded money from him before they returned his possessions. Halim alleged that the airport personnel treated only ethnic Chinese in this manner. Halim said that he complained about the crooked practice one time to an office at the airport, but nothing came of his complaint. Halim also testified about a hostile incident he had with a taxi driver when he accidently stepped on the taxi driver's foot. The driver told Halim that if he had his friends with him, they would have killed Halim.

Halim returned home for a year after completing his master's degree in 1999. Halim testified that people came to his home and would "knock at the door, asking for money, throwing rocks and saying Chinese likes to eat pork." Halim was never detained, arrested, prosecuted, or beaten because of his ethnicity during the year he lived in Indonesia. He flew to Los Angeles, California, in 2000.

Halim learned about Christianity when he lived and studied in Germany, but was not baptized until 2005. He fears returning to Indonesia as a practicing Christian because he read articles about churches being bombed in Indonesia and some were Christian churches. Halim, however, did not personally experience any discrimination on account of his Christian beliefs while he lived in Indonesia.

Halim also submitted documentation to the IJ about the turmoil that existed in Indonesia after his departure. The United States Department of State's 2010 Human Rights Report for Indonesia ("2010 Human Rights Report") indicated that the Indonesian government officially promoted racial and ethnic tolerance; yet, a number of laws, regulations, and decrees still had discriminatory effects on ethnic Chinese citizens. The United States Department of State's 2010 Religious Freedom Report for Indonesia ("2010 Religious Freedom Report") described the religious, legal, and political framework of the country and documented several of the religious abuses which occurred between 2008 and 2010. Various internet articles detailed religious attacks on Christians and the continued discrimination against ethnic Chinese throughout Indonesia.

At the time of Halim's removal proceedings, his father and four of his five siblings still lived in Medan. His four siblings owned their own businesses in Indonesia.

The IJ denied Halim's requests and ordered his deportation. First, the IJ determined that Halim's asylum application was untimely because he filed it more than one year after his arrival in the United States. Next, the IJ determined that Halim did not qualify for withholding of removal, finding that the evidence did not demonstrate that Halim had personally suffered past persecution or that he would face a clear probability of future persecution if he returned to Indonesia. The IJ also found that the evidence did not support Halim's claim that a pattern or practice of persecution against Chinese Christians as a group existed in Indonesia. Finally, the IJ determined that Halim did not qualify for protection under the CAT.

On appeal to the BIA, Halim challenged the IJ's denial of withholding of removal and protection under the CAT. Halim did not contest the IJ's finding that his application for asylum was untimely. The BIA agreed with the IJ that Halim failed to meet his burden of showing past persecution or a clear probability of future persecution in order to qualify for withholding of removal. The BIA also concluded that Halim failed to establish that he faced a clear probability of torture, a requirement for CAT protection. The BIA upheld the IJ's order and dismissed the appeal.

## II. DISCUSSION

On appeal, Halim now argues only that he is entitled to withholding of removal. He does not contest the BIA's denial of his application for asylum or protections under the CAT in

his brief and he has waived his right to review of these issues. *Asere v. Gonzales*, 439 F.3d 378, 381 (7th Cir. 2006). Halim focuses his appeal on the legal standards required for withholding of removal that this Circuit discussed in *Salim v. Holder*, 728 F.3d 718 (7th Cir. 2013). Halim contends that he has a well-founded fear of future persecution based on the "pattern and practice" of persecution in Indonesia against groups of similarly-situated ethnic Chinese and/or Christians. As an alternative, Halim contends that he met his burden of proof and showed that he faces an individualized risk of persecution if he is forced to return to Indonesia. Halim does not argue that he experienced past persecution, which under 8 C.F.R. § 208.16(b)(1)(i) would entitle him to a presumption that he would face future persecution upon his return to Indonesia.

When the BIA adopts and affirms the IJ's decision and adds its own analysis, as it did here, we review both decisions. *See Bathula v. Holder*, 723 F.3d 889, 897 (7th Cir. 2013); *Familia Rosario v. Holder*, 655 F.3d 739, 743 (7th Cir. 2011). We apply the principles of *Chevron* deference to the BIA's interpretation of the immigration laws. *Scialabba v. Cuellar de Osorio*, No. 12-930 (U.S. June 9, 2014), Slip. Op. 13 (plurality opinion); see *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–844 (1984). Thus, we apply a statute's plain meaning if the statute is clear, or we defer to the BIA's reasonable interpretation if the statute is unclear. *Id.* When the issue requires a review of the BIA's factual findings, as is the case here, we review the BIA's decision for substantial evidence. *See Bathula*, 723 F.3d at 897–98; *Vahora v. Holder*, 626 F.3d 907, 912 (7th Cir. 2010). We will affirm the BIA's determination to deny eligibility for withholding of removal if its determination "is

supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Vahora*, 626 F.3d at 912. We reverse only if the record "is so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 483–84.

To be eligible for withholding of removal, an applicant must prove a past or future "threat to life or freedom." 8 C.F.R. § 208.16(b)(1)-(2); *Yi Xian Chen v. Holder*, 705 F.3d 624, 628 (7th Cir. 2013). A threat to life or freedom is synonymous with persecution, which this Circuit defines as "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, torture, behavior that threatens the same, and non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe." *Yi Xian Chen*, 705 F.3d at 629 (internal citations omitted). "'Persecution' does not include the actions of private citizens 'unless the government is complicit in those acts or is unable or unwilling to take steps to prevent them.'" *Bitsin v. Holder*, 719 F.3d 619, 628 (7th Cir. 2013) (quoting *Chakir v. Gonzales*, 466 F.3d 563, 570 (7th Cir. 2006)).

If an applicant did not suffer past persecution, he must prove that it is "more likely than not" that he faces future persecution "on account of his race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b); *Bitsin*, 719 F.3d at 628. An applicant can prove a future threat to life or freedom in one of two ways: (1) establish that the country to which the applicant is to be

removed has a "pattern and practice of persecution" against "a group of persons similarly-situated to the applicant," or (2) establish that the applicant faces a personal risk of persecution if he is forced to return home. 8 C.F.R. § 208.16(b)(2)(i)-(ii); *Salim*, 728 F.3d at 722–23.

## A. Halim's Pattern or Practice of Persecution Claim

An applicant for withholding of removal faces a difficult burden to prove that a country has a pattern or practice of persecuting a group similarly-situated to himself. *Mitreva v. Gonzales*, 417 F.3d 761, 765 (7th Cir. 2005). To establish a country's pattern or practice of persecution, an applicant must prove the existence of a "systematic, pervasive, or organized effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetuated or tolerated by state actors." *Ingmantoro v. Mukaskey*, 550 F.3d 646 (7th Cir. 2008). Pattern or practice cases require an extreme level of persecution because "once the court finds that a group was subject to a pattern or practice of persecution, every member of the group is eligible." *Ahmed v. Gonzales*, 467 F.3d 669, 675 (7th Cir. 2006).

### 1. Whether a Pattern or Practice of Persecuting Ethnic Chinese Exists in Indonesia

This Circuit denied the petitions of Chinese Christians being deported to Indonesia in three prior cases because petitioners could not prove that Indonesia's government had a pattern or practice of persecuting members of similarly-situated racial or religious groups. *See Salim*, 728 F.3d 718; *Ingmantoro*, 550 F.3d 646; *Kaharudin v. Gonzales*, 500 F.3d 619 (7th Cir. 2007). These cases do not foreclose Halim's petition

because each application for withholding of removal is independently reviewed to ensure that human rights conditions have not deteriorated to an extreme level of persecution. *Ingmantoro*, 550 F.3d at 651. However, they do present a significant hurdle for him to overcome.

Halim submitted the 2010 Human Rights Report to the IJ to support his argument that a pattern or practice of persecution of ethnic Chinese exists in Indonesia. He argues that the evidence we reviewed in *Ingmantoro* and *Kaharudin* is now outdated and does not reflect the current conditions in Indonesia. The 2010 Human Rights Report stated that the Indonesian "government officially promotes racial and ethnic tolerance" and that ethnic Chinese "increasingly participated in politics." However, the report also stated that "[a] number of articles of law, regulation, or decree discriminated against ethnic Chinese citizens" and "public servants still discriminated against them when issuing marriage licenses and in other services."[1] The 2010 Human Rights Report, however, is insufficient to establish a pattern or practice of persecution: the "systematic, pervasive, or organized effort to kill, imprison, or severely injure" ethnic

---

[1] The 2013 Human Rights Report, the most recent report, does not include the statement "[a] number of articles of law, regulation, or decree discriminated against ethnic Chinese citizens." Instead, the 2013 report only concludes that "[t]he government officially promotes racial and ethnic tolerance." U.S. Dep't of State, Indonesia 2013 Human Rights Report, http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2013&dlid=220196. Contrary to Halim's argument, the Human Rights Reports support the conclusion that conditions for ethnic Chinese in Indonesia are improving since the riots of the 1990s. See more at: http://www.state.gov/j/drl/rls/hrrpt/.

Chinese in Indonesia. While the report alluded to discrimination against ethnic Chinese, "[g]eneral conditions of hardship that affect entire populations, however, are not persecution." *Ahmed*, 467 F.3d at 673. We agree with the IJ and BIA that the evidence did not rise to the level necessary to establish a pattern or practice of persecution.

### 2. Whether a Pattern or Practice of Persecuting Christians Exists in Indonesia

To establish that he faces a likelihood of future persecution based on his Christian faith, Halim testified before the IJ and presented evidence of the religious tensions in Indonesia. Halim now relies on an article about attacks at Christian churches in Indonesia and the 2010 Religious Freedom Report.

The article mentioned a report that chronicled religious attacks on Christians, but a researcher for the report said "'[t]he dominant actors who committed violence are vigilante groups,'" not the Indonesian government. In the article, the Minister of Religious Affairs for Indonesia downplayed the existence of religious discrimination and said that the "main cause of religious tensions was that some groups did not want to meet legal requirements for establishing houses of worship."[2] The Setara Institute for Democracy and Peace, a non-government organization which promotes human rights in Indonesia, also appreciated the steps the local police took against the perpetrators of a violent attack at a Christian

---

[2]   The legal requirements for establishing a house of worship require the approval of local community members, which can be difficult for Christians to obtain in neighborhoods with a Muslim majority.

church in which the pastor and an elder were stabbed. The Indonesian Supreme Court also upheld an administrative court's ruling to allow the building permit of a Christian church. The article did conclude, however, that Indonesian politicians and police should take further steps to resolve religious conflict.

The 2010 Religious Freedom Report mirrored much of what was said in the article, but stressed that the Indonesian government increased efforts to condemn religiously moti-vated attacks and promote human rights. For example, the Indonesian government hosted its first-ever interfaith dia-logue with United States delegates in 2010, which encouraged interfaith participation and addressed community needs. Religious organizations, such as Nahdlatul Ulama's Lakpesdam, developed scholarship programs to enable Muslim students to study Christian theology at Christian schools. Local governments prosecuted individuals suspected of committing past religiously-motivated violence. And, local police reportedly protected churches holding joint Christian and Muslim religious services in Poso, an area "once the scene of extreme tension and sectarian violence."

Though religious conflict persists in Indonesia, its govern-ment has notably taken steps to protect its citizens and promote religious tolerance. Respect for religious freedom in Indonesia appears to have improved since 2004 when the Fifth Circuit held that there was clear evidence that the Christian petitioners had an objective fear of future persecution based on their faith under the present conditions of civil unrest. *Eduard v. Ashcroft*, 379 F.3d 182, 191 (5th Cir. 2004) (reversed and remanded because "[a] review of the record indicate[d] that

Petitioners' fears of persecution were based on their Christian faith in particular, and Indonesian civil strife in general."). In this case, the evidence indicates that the Indonesian government neither implemented nor permitted others to systematically and pervasively persecute Christians. To the contrary, the evidence shows that local and national government took actions to improve religious freedoms for Christians and other faiths. Therefore, substantial evidence in the record supported the IJ's and BIA's determinations that the Indonesian government does not allow a pattern or practice of persecuting Christians.[3]

### B. Halim's Individualized Risk of Future Persecution Claim

As an alternative, Halim argues that the record reflects that he has a well-founded fear that he will be singled out and targeted as a Chinese Christian upon his return to Indonesia. He contends that the general reports of continued ethnic and religious discrimination in Indonesia in conjunction with his proximity to the violent riots in the 1990s justify his fear of persecution.

Belonging to a disfavored group does not entitle Halim to a lower standard of evidence to prove his individualized fear of persecution. *Salim*, 728 F.3d at 723–24. The standard is

---

[3] The 2012 Religious Freedom Report still documented abuses of religious freedom in Indonesia, but conditions for Christians did not show a drastic decline or improvement from the 2010 report. U.S. Dep't of State, Indonesia 2012 International Religious Freedom Report, http://www.state.gov/j/drl/rls/irf/religiousfreedom/index.htm?year=2012&dlid=208232.

objective, and Halim must show "'specific, detailed facts supporting the reasonableness of [his] fear'" that it is more likely than not that he "'will be singled out for persecution'" if deported. *Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir. 1999) (quoting *Bevc v. INS*, 47 F.3d 907, 910 (7th Cir. 1995)). A petitioner may rely on past persecution to "'imply a future threat'"; however, "'the focus remains on what is likely to happen following an alien's return home.'" *Kaharudin*, 500 F.3d at 623 (quoting *Kobugabe v. Gonzales*, 440 F.3d 900, 901 (7th Cir. 2006)).

The specific facts highlighted by Halim fall short of showing that he has an individualized risk of being singled out for persecution. Halim was an unscathed bystander of the 1994 riot that occurred near his sister's shop. He was not targeted nor was his sister's shop damaged. Halim was in Germany during the 1998 riot, his family was not injured, and his family's house was not damaged. Furthermore, the airport personnel's unusual treatment of Halim, the taxi driver's threatening comment, and the disgruntled people who came to his house were merely anecdotes of "unpleasant and even dangerous conditions [that] do not necessarily rise to the level of persecution." *Mitev v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995); *see also Kaharudin*, 500 F.3d at 623 (past encounters when native Indonesians "called her derogatory names, spat upon her, hit her with rocks and touched her buttocks" did not amount to persecution). Further undermining Halim's claim is the fact that his family continues to operate businesses and reside in Indonesia unharmed. The IJ's and the BIA's decisions were supported by substantial evidence that Halim did not reason-

ably fear an individualized threat of persecution upon his return home.

### III.  CONCLUSION

Halim failed to meet the test required for withholding of removal. He did not show a pattern or practice of persecution of Chinese Christians in Indonesia, nor could he establish that his personal fear of persecution was reasonable. For these reasons, his petition for review is DENIED.