**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 3, 2015
Decided March 26, 2015

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 14-2275

| | |
|---|---|
| GRACE SELFIE TANGKA,<br>*Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals. |
| *v.* | No. A200-823-224 |
| ERIC H. HOLDER, JR.,<br>Attorney General of the United States,<br>*Respondent*. | |

**O R D E R**

Grace Selfie Tangka, an Indonesian national, petitions for review of the denial of her application for asylum and withholding from removal based on her fear of persecution because of religion (Christianity) and race (Chinese ethnicity). Tangka's application largely rested on a single incident—the kidnapping of her American-born, infant daughter from a shopping mall in Bogor, Indonesia while she was attending Christian worship services. The immigration judge denied the application because he found that Tangka did not present sufficient evidence to show a sufficient nexus between the kidnapping and her Christian faith. We deny the petition.

Tangka entered the United States on a visitor's visa in late 2006 and gave birth to a daughter, Britney, the following September. The record isn't clear, but she says that she twice applied to extend her visa but never got a response. In late 2007 she returned with her daughter to Indonesia.

At the beginning of 2010, unknown people threatened, according to Tangka's testimony, her and her family for hosting Christian worship services: they screamed and threw stones at their house, made threatening phone calls, and sent letters saying they would kill them if they continued the services.

The kidnapping at the heart of these proceedings occurred in April 2010. As Tangka testified later at her removal hearing, Britney was taken from a playroom adjacent to a rented storefront that her Christian church was using in a mall for worship services. After she discovered that her daughter was missing, Tangka asked a security guard at the mall if he saw her daughter, but otherwise did not report Britney's disappearance because, she said, a child cannot be reported missing in Indonesia until 48 hours have passed. The next day, Tangka's nephew, who was vacationing in a city 80 kilometers away, stated in a letter that he saw a child resembling Britney with "a woman and a short and fat man." He immediately called Tangka, who told him that Britney had been kidnapped. The nephew said that he "chased" the couple, who released Britney "without confrontation."

Tangka also testified about a phone call that her husband supposedly received an hour after the kidnapping. The unidentified caller told Tangka's husband not to call the police or look for their daughter. The caller called them *kafir*, which means "people who don't have God," and said that they were not doing what they were told, a command that Tangka understood to mean that they should stop practicing Christianity. When first questioned by her lawyer, Tangka responded that she could not identify the caller. But when the IJ pursued the line of questioning, Tangka replied that she knew that Muslims must have kidnapped Britney because she had noticed persons that morning who were wearing clothing that gave them "something to cover." She explained, "I saw from inside [the separate room where the worship service was being held.] I didn't see them that clear."

Tangka flew to the United States with Britney in August 2010, but was told upon arriving in San Francisco that she had overstayed her prior visa and thus did not have valid entry documents. An asylum officer interviewed Tangka and determined that she had a credible fear of returning to Indonesia. She subsequently applied for asylum and

withholding of removal, outlining the details of her daughter's kidnapping and expressing fear of persecution based on her faith and ethnicity. In support of her application, Tangka included a statement from her husband that made no reference to the phone call he reportedly received after the kidnapping; a statement from her nephew, stating only that he found Britney with a man and a woman; a statement from her father saying simply that conditions are dangerous; and a statement from a friend who asserts, without having seen any of the events, that Britney was taken because of Tangka's beliefs.

The IJ denied her requests for relief. The IJ identified the kidnapping incident as the focus of Tangka's claim and "does not question" that Britney "may have been kidnapped by an unknown person," but he concluded that Tangka had not established a nexus between her daughter's kidnapping and a protected ground. The IJ noted that Tangka did not know who kidnapped her daughter and could only speculate about the reason for the incident, and the IJ specifically discredited her "self-serving" testimony that the anonymous phone call could establish the requisite nexus. Her written application (as well as her husband's statement) did not mention the anonymous phone call, nor did she say why she could not have obtained a statement from the police or mall security guard about Britney's disappearance. And even if there were a sufficient nexus, Tangka did not attempt to report the kidnapping to the government and therefore had not established that the government was unwilling or unable to control a non-state actor. Finally the IJ determined that Tangka's evidence did not show a pattern and practice of persecution of Christians or ethnic Chinese in Indonesia.

The BIA agreed with the IJ's analysis and dismissed Tangka's appeal.

Tangka first challenges the IJ's findings that she had not shown a sufficient nexus between her Christian/ ethnic Chinese status and Britney's kidnapping. Victims rarely know their kidnapper's identity, she maintains, and the IJ was wrong to discredit her testimony based on her inability to identify Britney's kidnappers.

An asylum applicant's fear of persecution must be "on account of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Bathula v. Holder*, 723 F.3d 889, 900–02 (7th Cir. 2013). The applicant bears the burden of providing "direct or circumstantial evidence that the [persecutor] was motivated by these factors." *Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011); s*ee also INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). The protected factor does not have to be the only reason for the persecution, but the factors listed in the statute

must be one of the motives. *See Bueso-Avila*, 663 F.3d at 937; *Guerra-Marchorro v. Holder*, 760 F.3d 126, 128–29 (1st Cir. 2014)

Substantial evidence supports the IJ's determination that Tangka failed to establish a sufficient nexus. Setting to one side the phone call, about which the IJ found that Tangka had not testified credibly, Tangka's only evidence of nexus is her viewing of Muslims in the vicinity before Britney's kidnapping. Without any further evidence about the reasons behind the kidnapping or the identity of the kidnappers, the IJ did not err in rejecting Tangka's speculation about the kidnappers' motive. Moreover, Tangka misapprehends the significance of the IJ's comment that she did not know the identity of her daughter's kidnappers. An applicant need not know the identity of a kidnapper, but must still provide some evidence that goes to the persecutor's motive. *Cf. Gomes v. Gonzales*, 473 F.3d 746, 755 (7th Cir. 2007) (identity of attackers not critical when eyewitnesses provided statements on perpetrators and their motive); *Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir. 2003) (identity of attackers not critical when timing and attackers' comments provided evidence of motive). Here, the IJ reasonably explained that he was, "looking for something that would tie the kidnapping to the respondent's religion."

Tangka also challenges the IJ's finding that he didn't believe her testimony about the post-kidnapping phone call that her husband purportedly received. She urges that she "could not attest to a phone call she did not personally receive," that her husband—who was best positioned to discuss the call—does mention a phone call in his written statement, and, that any confusion must be due to "inartful English."

Substantial evidence supports the IJ's adverse credibility finding. Our review of a credibility finding is "highly deferential," *Hassan v. Holder*, 571 F.3d 631, 637 (7th Cir. 2009), and an IJ may question why an applicant's hearing testimony includes significant events of persecution not included in prior written statements. *See Long-Gang Lin v. Holder*, 630 F.3d 536, 543–44 (7th Cir. 2010); *Torres v. Mukasey*, 551 F.3d 616, 632–33 (7th Cir. 2008); *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 480–81 (7th Cir. 2007). Tangka blames the omission of the phone call on language difficulties that she and her husband had with their written statements. But an IJ need not accept such a vague explanation, and it was not impermissible for the IJ here to conclude that the nature of the particular discrepancies at issue should weigh against her. *See Tarraf v. Gonzales*, 495 F.3d 525, 533–34 (7th Cir. 2007). Although Tangka's husband did refer in his statement to a phone call, he does not characterize it in terms of any kidnapping incident.

Tangka next challenges the IJ's rejection of her claim that she fears future persecution based on a pattern and practice of persecution of ethnic-Chinese Christians in Indonesia. She cites secondary sources, including State Department reports, that chronicle religious attacks on Christians and Christian churches throughout Indonesia. She also asserts without citation that the Ninth Circuit has recognized the "disfavored status" of ethnic-Chinese Christians in Indonesia.

Substantial evidence supports the agency's determination that Tangka failed to establish a pattern and practice of discrimination, which requires that the persecution be "systematic, pervasive, or organized effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetuated or tolerated by state actors." *Halim v. Holder*, 755 F.3d 506, 512 (7th Cir. 2014) (internal quotation and citation omitted). Although the secondary sources detail violence towards churches and Christians as well as complicity by some government officials, the sources also attribute these attacks to vigilante groups and suggest that the Indonesian government is taking steps to promote religious freedom. In past cases involving similar facts surrounding the treatment of Christians in Indonesia, we have concluded that these conditions did not rise to the level of a pattern or practice of persecution. *Halim*, 755 F.3d at 512–14 (relied on the same 2010 Human Rights Report); *Ingmantoro v. Mukasey*, 550 F.3d 646, 651–52 (7th Cir. 2008); *Kaharudin v. Gonzales*, 500 F.3d 619, 623–625 (7th Cir. 2007). We have rejected the disfavored-group approach embraced by the Ninth Circuit because it is "less stringent " than showing a "reasonable possibility (in the asylum context) or that it is more likely than not (in the withholding context)" that an applicant's life or freedom would be threatened based on the persecution of a similarly situated group. *Salim v. Holder*, 728 F.3d 718, 722 (7th Cir. 2013) (internal citations omitted). *See Ingmantoro*, 550 F.3d at 652 n.7; *Kaharudin*, 500 F.3d at 625.

Finally, Tangka renews her argument for withholding of removal. But because she cannot establish persecution, she necessarily fails to meet the higher standard required for withholding of removal. *See Georgieva v. Holder*, 751 F.3d 514, 523 (7th Cir. 2014); *Toure v. Holder*, 624 F.3d 422, 428 (7th Cir. 2010); *Torres*, 551 F.3d at 625.

Accordingly, we DENY the petition.